


FILED

May 01 2025, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

In the Involuntary Termination of the Parent-Child Relationship
of: J.W. (Minor Child),

and

T.M. (Father)

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

---

May 1, 2025

Court of Appeals Case No.
24A-JT-2943

Appeal from the Sullivan Circuit Court

The Honorable Robert E. Hunley II, Judge

**Opinion by Judge Bradford**
Judges Pyle and Kenworthy concur.

**Bradford, Judge.**

# Case Summary

[1]     J.W. ("Child") was found to be a child in need of services ("CHINS") on July 28, 2021, after the Indiana Department of Child Services ("DCS") received reports of neglect and the lack of a sober care giver. T.M. ("Father") was ordered to participate in various services. Father failed to successfully complete the court-ordered services. On June 1, 2024, DCS filed a petition to terminate Father's parental rights to Child. Following an evidentiary hearing, the juvenile court issued an order terminating Father's parental rights to Child.[1] Father contends on appeal that the evidence is insufficient to sustain the juvenile court's order terminating his parental rights. Father alternatively contends that DCS violated his due-process rights by failing to make reasonable efforts to reunify him with Child. We affirm.

---

[1] M.W. ("Mother") consented to Child's adoption and does not participate in this appeal.

# Facts and Procedural History

[2] Father has an extensive criminal history,[2] has been classified as a sexually-violent predator, and is required to register as a sex offender. Despite knowing that he was required to do so, Father has failed to register on numerous instances, leading to periods of incarceration. At one point, a restriction was added to Father's parole conditions, forbidding him to have contact with any children under the age of sixteen, including his own.

[3] Child was born to Mother and Father on November 1, 2019. In early 2021, then-one-and-a-half-year-old Child was living with Mother and multiple other family members when DCS received a report regarding potential educational neglect regarding Child's older siblings. Child's siblings had "switched to a brand-new school" after Christmas break, and by February 20, 2021, "had already missed ten days." Tr. Vol. II p. 18. DCS visited the family's home, assessed the home conditions, and found them to be "well below minimum standard living conditions, with debris and junk piled across the floor, hardly any walkways throughout the room, and no bed sheets on [Child's] dirty mattress." Tr. Vol. II p. 18. Child had been "left in a playpen[]" and Mother "had also tested positive for" methamphetamine. Tr. Vol. II p. 18.

---

[2] Father's criminal history includes, but is not necessarily limited to, a misdemeanor conviction for disorderly conduct and felony convictions for criminal deviate conduct, failing to register as a sex offender, possession of methamphetamine, and driving while suspended with a prior conviction within ten years. He has also been found to have violated the terms of his probation.

[4] DCS removed Child and siblings from Mother's care and placed them with an aunt and uncle, where they stayed until February of 2023. At the time Child was removed from Mother's care, Father "was living in [another town] with his now-wife[]" and "was involved with an informal adjustment with his wife and her son." Tr. Vol. II p. 18. Father was "actively testing positive for" methamphetamine at this time. Tr. Vol. II p. 53.

[5] On April 9, 2021, DCS filed a petition alleging that Child and siblings were CHINS due to educational neglect, substandard home conditions, and Mother testing positive for methamphetamine. On July 28, 2021, the juvenile court adjudicated Child to be a CHINS. The juvenile court subsequently entered a dispositional decree in which it ordered Father to complete certain services. Among other things, the dispositional decree required Father to abstain from illegal substances, complete parenting and substance-abuse assessments and follow all recommendations, submit to random drug screens, obey the law, and attend supervised visitation with Child.

[6] Father was noncompliant with the court ordered substance-abuse services and "about 50 percent compliant with meeting for home-based case management services." Tr. Vol. II p. 21. Father was initially awarded visitation with Child twice a week for one hour, and the visits were eventually increased to two hours each. However, as the case progressed, Father started to miss visits. When Father did attend visits, his wife "did most of the parenting." Tr. Vol. II p. 26. Eventually, visitation was suspended after DCS learned of the condition of Father's parole that precluded him from having contact with children under the

age of sixteen, including Child. Additionally, Father continued to test positive for methamphetamine throughout the case. Father refused to screen on at least one occasion. Father was also incarcerated multiple times during the CHINS case, for a total period of approximately two and one-half years. While Father did not receive services during his periods of incarceration, DCS reinitiated services for Father when he was released.

[7] In June of 2024, DCS filed its petition to terminate Father's parental rights to Child. The juvenile court held an evidentiary hearing on DCS's petition on October 2, 2024. As of the date of the evidentiary hearing, Child had been in her current, pre-adoptive placement for sixteen months. DCS family case manager Brook Knight ("FCM Knight") testified that despite suffering from "very high" ADHD and reactive attachment disorder ("RAD"), Child had bonded with and "adjusted to [her placement's] family life quite well." Tr. Vol. II p. 45. When Child had first been placed in this placement, she had been "erratic" and "almost nonverbal" but had made significant improvements and appeared to be on-track developmentally. Tr. Vol. II p. 61. As of the date of the evidentiary hearing, Child was participating in therapy and had been enrolled in preschool. Both FCM Knight and court-appointed special advocate Jeanne Hall ("CASA Hall") testified that they believed that termination of Father's parental rights was in Child's best interests. Both FCM Knight and CASA Hall noted Child's need for stability and Father's lack of sobriety and stability. On November 4, 2024, the juvenile court issued its order terminating Father's parental rights to Child.

## Discussion and Decision

[8] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *Bester v. Lake Cnty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights, therefore, are not absolute and must be subordinated to the best interests of the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[9] In reviewing termination proceedings on appeal, we will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* "A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it." *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

## I.    Father's Sufficiency-of-the-Evidence Claims

Effective March 11, 2024, in order to terminate a parent's parental rights to a child, DCS must prove that there is a satisfactory plan for care and treatment of the child and that termination of the parent-child relationship is in the child's best interests. Ind. Code § 31-35-2-4(c)(2)–(3). As is relevant to this case, Indiana Code section 31-35-2-4(c)(1) further provides that DCS must also prove the existence of *one or more* of the following circumstances:

> (2) That:
>> (A) the child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child; and
>> (B) despite the department's reasonable efforts to preserve and reunify the child's family under IC 31-34-21-5.5, the parent has been unable to remedy the circumstances that resulted in the child being placed in care outside the parent's home.

(3) That there is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(4) That there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being, safety, physical health, or life of the child.

****

(8) That the parent is incarcerated and one (1) or more of the following is true:
> (A) The parent is expected to remain incarcerated for a significant portion of the remaining time during which the child is less than eighteen (18) years of age.
> (B) The parent is a sexually violent predator (as defined by IC 35-38-1-7.5).

****

(12) That the parent is required to register as a sex or violent offender under IC 11-8-8.

Ind. Code § 31-35-2-4(d). Father does not argue on appeal that DCS failed to prove that it has a satisfactory plan for care and treatment of Child, with that plan being adoption. In challenging the sufficiency of the evidence to support termination of his parental rights to Child, Father argues that DCS failed to prove Indiana Code sections 31-35-2-4(c)(1) and (c)(3).

## A.    Indiana Code section 31-35-2-4(c)(1)

[12]    In this case, DCS alleged that termination of Father's parental rights was warranted under subsections (d)(2), (d)(3), (d)(4), (d)(8), and (d)(12). Indiana Code section 31-35-2-4(c)(1) explicitly provides that DCS must prove "*one (1) or*

*more* of the circumstances described in subsection (d)[.]" (Emphasis added). Thus, DCS was only required to prove one of the circumstances listed in subsection (d) in support of its petition to terminate Father's parental rights to Child. *See generally In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003) (addressing the prior version of the statute and explaining that because Indiana Code section 31-35-2-4(b)(2)(B) had used the word "or" and had therefore been written in the disjunctive, the juvenile court had only been required to find that one prong of subsection (B) had been proven by clear and convincing evidence), *trans. denied*.

[13] Pursuant to subsection (d)(3), the juvenile court concluded that there was a reasonable probability that the conditions that resulted in Child's removal from and continued placement outside of Father's home will not be remedied.

> When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In so doing, the trial court may consider the parent's response to the services offered through [DCS]. A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change. Additionally, [DCS] was not required to rule out all possibilities of change; rather, it needed to establish only that there is a reasonable probability that the parent's behavior will not change.

*In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008) (internal citations and quotations omitted), *trans. denied*.

[14]    With respect to the reasonable probability that the conditions would not be remedied, the juvenile court found,

> It is evident to the Court that the Father is unlikely to remedy the reasons the Child has been removed from the home. Father has repeatedly and seemingly willfully failed to follow through with his requirement to register as a sex offender, leading to multiple convictions and periods of incarceration. The Court has no reason to believe this will not continue into the future, especially based on Father's testimony where he downplayed the initial conviction. Father also seemingly never addressed his substance abuse issues while he was on release, continuing to test positive for methamphetamine throughout the case. These two issues create an environment of instability that will place this Child at risk due to their ADHD and RAD…. DCS has met it's [*sic*] burden to terminate Father's parental rights by clear and convincing evidence.

Appellant's App. Vol. II p. 20. The juvenile court further found that the terms of Father's parole prohibit him from having contact with any minor children, including his own. Also, when Father did participate in services, he was only partially compliant. The juvenile court additionally found the following:

> 29. Father's failure to participate in his own services gives the Court great concern that he will meet the Child's needs going forward.
> 30. Specifically, from what was testified regarding visits, Father appeared to take a back seat and allowed others to parent.
> 31. Considering the needs of the Child, this would put the Child at risk if in the care of the Father.

32. Additionally, the Father's multiple criminal convictions demonstrate that he will not be able to provide stability.

33. He was charged and convicted multiple times in a year period for failing to register as a sex offender.

34. Also, Father's testimony during the hearing demonstrates a lack of remorse for what he has done, as he attempted to downplay the severity of his crime.

35. The Court finds that his failure or even refusal to follow through with this basic responsibility creates a major risk of instability for the Child if the Child were returned to his care.

36. Father could still easily be incarcerated again for failing to register, as he is still required to do so. The Court has no confidence that [Father] will follow through with this responsibility based on his prior actions.

Appellant's App. Vol. II p. 16. Ultimately, the juvenile court concluded that Father "has been unable to remedy the reasons for removal and is unlikely to do so." Appellant's App. Vol. II p. 18.

[15] Father does not challenge any of the juvenile court's findings on appeal. The juvenile court's findings must therefore be accepted as true. *See Moriarty v. Moriarty*, 150 N.E.3d 616, 626 (Ind. Ct. App. 2020) (providing that unchallenged findings must be accepted as true), *trans. denied*. "[I]f the unchallenged findings are sufficient to support the judgment, we will affirm." *Id.*

[16] The unchallenged findings establish that Father, due to his unwillingness to comply with sex-offender registration requirements, has been incarcerated for approximately two-and-one-half years during the CHINS case. Father has an extensive criminal history with frequent periods of incarceration. We have

previously recognized that "individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (internal brackets and quotation marks omitted), *trans. denied*.

[17] Moreover, during the periods when he was not incarcerated, Father has failed to consistently participate in services, remain drug free, or consistently visit with Child. Despite being offered services aimed at helping Father overcome his substance-abuse issues, Father continued to test positive for methamphetamine. Father only attended approximately fifty percent of his scheduled visits with Child and, when he did attend, he often let other individuals take the lead parenting role. Once Father's visitation rights were suspended due to his parole condition, he did not attempt to have the condition removed or changed. Father has demonstrated a historical pattern of instability, which given Child's special needs, would be very detrimental to Child moving forward. While Father claims that he "would do anything[]" to reunify with Child, his actions have proven otherwise. Tr. Vol. II p. 70. Father's habitual patterns of substance abuse and criminal conduct support the inference that there is a substantial probability of future neglect of Child by Father. *See K.T.K. v. Ind. Dept. of Child Servs., Dearborn Cnty. Off.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (providing that Mother's habitual pattern of substance abuse and criminal conduct resulted in continued neglect of Child such that there was a substantial probability of future neglect). Father's challenge to the sufficiency of the

evidence to support this conclusion effectively amounts to an invitation to reweigh the evidence, which we will not do.[3] *See In re S.P.H.*, 806 N.E.2d at 879.

## B.     Indiana Code section 31-35-2-4(c)(3)

[18]     We are mindful that in considering whether termination of parental rights is in the best interests of the child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cnty. Off. of Fam. & Child.*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the [child]." *Lang v. Starke Cnty. Off. of Fam. & Child.*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied*.

> The [juvenile] court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. Additionally, a child's need for permanency is an important consideration in determining the best interests of a

---

[3] We note that Father argued that the trial court's reliance on Indiana Code section 31-35-2-4(d)(8) and (d)(12) violated his fundamental due process rights. However, having concluded that DCS proved Indiana Code section 31-35-2-4(d)(3), *i.e.*, that there is a reasonable probability that the conditions that resulted in Child's removal or continued placement outside of Father's home will not be remedied, we need not consider whether the evidence supports the trial court's findings relating to Indiana Code section 31-35-2-4(d)(2), (d)(4), (d)(8), or (d)(12). As such, we need not consider whether subsections (d)(8) or (d)(12) violated Father's fundamental due process rights.

child, and the testimony of the service providers may support a finding that termination is in the child's best interests.

*In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (internal citations omitted).

[19] FCM Knight testified that termination of Father's parental rights was in Child's best interest. Specifically, FCM Knight testified that Child "needs stability -- long-term stability, with individuals who are more than willing to go above and beyond to meet all of her needs, to where she has a sober caregiver, somebody who is -- a family that's going to be consistent." Tr. Vol. II pp. 47–48. In FCM Knight's opinion, Father would not be able to provide Child with long-term stability.

[20] CASA Hall also testified that termination of Father's parental rights was in Child's best interests. CASA Hall testified that Child "has done remarkably well" since being placed in her current pre-adoptive placement. Child had been "almost nonverbal[]" and "erratic[]" when placed in her current placement. Tr. Vol. II p. 61. In the sixteen months that she had been in her current placement, Child "has calmed down[,]" participated in services, enrolled in preschool, and bonded with her placement family, who plan to adopt her. Tr. Vol. II p. 61. Child appears to be on-track developmentally. CASA Hall testified that her current placement provides Child with "a stable and loving home[,]" and in her opinion, it would be in Child's best interests for Father's parental rights to be terminated and for Child to remain in her current placement. Tr. Vol. II pp. 61–62. FCM Knight's and CASA Hall's testimony supports the finding that

termination of Father's parental rights is in Child's best interests. *See Lang*, 861 N.E.2d at 374 (providing that the testimony of the case worker, guardian ad litem, or a CASA regarding the children's best interests supports a finding that termination is in the children's best interests). This is especially true given Father's lack of stability and ongoing substance-abuse issues and frequent criminal activity. Father's challenge to the sufficiency of the evidence to support this conclusion again effectively amounts to an invitation to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## II.   Father's Due-Process Claim

[21]   In addition to challenging the sufficiency of the evidence to sustain the juvenile court's termination order, Father contends that DCS violated his due-process rights by failing to provide him with adequate services. We have recognized that "for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit[.]" *In re T.W.*, 135 N.E.3d 607, 615 (Ind. Ct. App. 2019), *trans. denied*. However, "[w]hat constitutes 'reasonable efforts' will vary by case[.]" *Id.* A parent's incarceration, without more, is "an insufficient basis for terminating parental rights." *In re B.H.*, 44 N.E.3d 745, 751 (Ind. 2015) (internal quotation marks omitted). In this case, the termination of Father's parental rights was not based solely on his incarceration, but rather on his inconsistent participation in services while not incarcerated and his ongoing drug use and lack of stability.

While it does not appear that Father was offered services while he was incarcerated, the record makes it clear that DCS offered services to Father during the periods of his release from incarceration but that he failed to take advantage of these services. Moreover, nothing in the record or Father's appellate arguments even suggests that he requested services while incarcerated. "[A] parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Furthermore,

> we have stated on several occasions that, although the DCS is generally required to make reasonable efforts to preserve and reunify families *during the CHINS proceedings*, that requirement under our CHINS statutes is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law.

*In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015) (emphasis in original, internal brackets and quotation marks omitted), *trans. denied*; *see also In re H.L.*, 915 N.E.2d 145, 148 (Ind. Ct. App. 2009); *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000).

The record reveals both that services were offered to Father when he was not incarcerated and that he received numerous services during the lengthy CHINS and termination proceedings. Father was only partially compliant with the services offered and continued to test positive for illegal drug use and display

overall instability. We therefore disagree with Father's assertion that DCS "abandoned its obligation to work toward reunification[.]" Appellant's Br. p. 14. Father has failed to convince us that he was denied due process.

[24] The judgment of the juvenile court is affirmed.

Pyle, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Gregory P. Bowes
Greg Bowes Legal Services, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana